# 23-8096

*To Be Argued By*:
DANIELLE R. SASSOON

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 23-8096

———◆◆◆———

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

JONATHAN DAVILA,

*Defendant-Appellant.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for the United States*
*of America.*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

DANIELLE R. SASSOON,
NATHAN REHN,
*Assistant United States Attorneys,*
*Of Counsel.*

## TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.   The Offense Conduct . . . . . . . . . . . . . . . . . .  2

    B.   The Charge and Guilty Plea . . . . . . . . . . . .  3

    C.   The Presentence Report and Davila's Sentencing . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

ARGUMENT:

Section 922(g)(1) is Constitutional . . . . . . . . . . . . . . .  5

    A.   Applicable Law . . . . . . . . . . . . . . . . . . . . . .  6

        1.   The Second Amendment and Prohibitions on Felons Possessing Firearms . . . . . . .  6

        2.   *Bruen* and *Rahimi* . . . . . . . . . . . . . . . . .  7

    B.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  9

        1.   *Bogle*'s Holding that Section 922(g)(1) Is Constitutional Remains Good Law and Forecloses Davila's Argument . . . . . . . .  9

        2.   Text and History Confirm that Section 922(g)(1) Is Constitutional . . . . . . . . .  13

ii

PAGE

a.  The Second Amendment's Text and Historical Context Demonstrate that Davila, a Convicted Felon, Is Not Among "the People" Entitled to Second Amendment Rights . . . . . 14

b.  The Nation's Historical Tradition of Firearms Regulation Supports the Constitutionality of Felon Disarmament Laws. . . . . . . . . . . . 21

c.  The Nation's Historical Tradition of Firearms Regulation Supports the Constitutionality of Laws Disarming Categories of Individuals Who Present a Danger of Misuse . . . . . 29

d.  Applying These Principles, Section 922(g)(1) Is Consistent with the Nation's Historical Tradition . . . . 37

e.  Davila May Not Obtain an As-Applied Exemption from Section 922(g)(1) Based on the Nature of His Prior Violent Felonies. . . . . . . . . . 41

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

iii

# TABLE OF AUTHORITIES

*Cases*:

*Antonyuk v. Chiumento*,
  89 F.4th 271 (2d Cir. 2023) . . . . . . . . . . . . . . . . 40

*Avery v. Everett*,
  18 N.E. 148 (N.Y. 1888) . . . . . . . . . . . . . . . . . . 22

*Baze v. Rees*,
  553 U.S. 35 (2008) . . . . . . . . . . . . . . . . . . . . . . 22

*Blanton v. City of North Las Vegas*,
  489 U.S. 538 (1989) . . . . . . . . . . . . . . . . . . . . . 43

*Branzburg v. Hayes*,
  408 U.S. 665 (1972) . . . . . . . . . . . . . . . . . . . . . 42

*Bucklew v. Precythe*,
  587 U.S. 119 (2019) . . . . . . . . . . . . . . . . . . . . . 22

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) . . . . . . . . . . . . . . . . . . *passim*

*Doe v. Reed*,
  561 U.S. 186 (2010) . . . . . . . . . . . . . . . . . . . . . 29

*Hamilton v. Pallozzi*,
  848 F.3d 614 (4th Cir. 2017) . . . . . . . . . . . . . . . 15

*In re Deming*,
  10 Johns. 232 (N.Y. 1813) . . . . . . . . . . . . . . . . . 23

*Kanter v. Barr*,
  919 F.3d 437 (7th Cir. 2019) . . . . . . . . . . . . . . . . 7

iv

PAGE

*Lewis v. United States*,
445 U.S. 55 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Lewis v. United States*,
518 U.S. 322 (1996). . . . . . . . . . . . . . . . . . . . . . . 42

*Libertarian Party of Erie County v. Cuomo*,
970 F.3d 106 (2d Cir. 2020) . . . . . . . . . . . . . . . . . 20

*McDonald v. City of Chicago*,
561 U.S. 742 (2010). . . . . . . . . . . . . . . . . . . . *passim*

*McIntyre v. Ohio Election Comm'n*,
514 U.S. 334 (1995). . . . . . . . . . . . . . . . . . . . . . . . 29

*Medina v. Whitaker*,
913 F.3d 152 (D.C. Cir. 2019). . . . . . . . . . . . *passim*

*N.Y. State Rifle & Pistol Ass'n v. City of New York*,
590 U.S. 336 (2020). . . . . . . . . . . . . . . . . . . . . 10, 22

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022). . . . . . . . . . . . . . . . . . . . . . . *passim*

*Quarles v. United States*,
139 S. Ct. 1872 (2019). . . . . . . . . . . . . . . . . . . . . . 44

*Range v. Attorney General*,
53 F.4th 262 (3d Cir. 2022) . . . . . . . . . . . . . *passim*

*Rehaif v. United States*,
588 U.S. 225 (2019). . . . . . . . . . . . . . . . . . . . . . . . 38

*Richardson v. Ramirez*,
418 U.S. 24 (1974). . . . . . . . . . . . . . . . . . . . . . 17, 19

*Spencer v. Kemna*,
523 U.S. 1 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . 17

v

PAGE

*Tyler v. Cain,*
    533 U.S. 656 (2001). . . . . . . . . . . . . . . . . .  15, 35, 36

*Tyler v. Hillsdale County Sheriff's Dep't,*
    837 F.3d 678 (6th Cir. 2016) . . . . . . . . . . . . 17, 18

*United States v. Bell,*
    524 F.2d 202 (2d Cir. 1975) . . . . . . . . . . . . . . . 12

*United States v. Bena,*
    664 F.3d 1180 (8th Cir. 2011) . . . . . . . . . . . . . . 18

*United States v. Bogle,*
    717 F.3d 281 (2d Cir. 2013) . . . . . . . . . . .  7, 10, 11

*United States v. Carpio-Leon,*
    701 F.3d 974 (4th Cir. 2012) . . . . . . . . . . . . . . . 18

*United States v. Colasuonno,*
    697 F.3d 164 (2d Cir. 2012) . . . . . . . . . . . . . . . 12

*United States v. Decastro,*
    682 F.3d 160 (2d Cir. 2012) . . . . . . . . . . . . . 20, 22

*United States v. Gay,*
    98 F.4th 843 (7th Cir. 2024). . . . . . . . . . . . . . . 45

*United States v. Jackson,*
    69 F.4th 495 (8th Cir. 2023). . . . . . . . . . . . *passim*

*United States v. Jimenez,*
    895 F.3d 228 (2d Cir. 2018) . . . . . . . . . . . . . . . . 9

*United States v. Ogidi,*
    No. 23-6325, 2024 WL 2764138
    (2d Cir. May 30, 2024) . . . . . . . . . . . . . . . . . . . 13

vi

PAGE

*United States v. Peguero,*
    34 F.4th 143 (2d Cir. 2022) . . . . . . . . . . . . . . . . . 12

*United States v. Perez,*
    6 F.4th 448 (2d Cir. 2021) . . . . . . . . . . . . 7, 18, 32

*United States v. Pimentel,*
    932 F.2d 1029 (2d Cir. 1991) . . . . . . . . . . . . . . . . . 3

*United States v. Rahimi,*
    144 S. Ct. 1889 (2024). . . . . . . . . . . . . . . . . . *passim*

*United States v. Skoien,*
    614 F.3d 638 (7th Cir. 2010) . . . . . . . . . . . . . . . . 35

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990). . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Williams,*
    --- F.4th ---, 2024 WL 3912894
    (6th Cir. Aug. 23, 2024) . . . . . . . . . . . . . . . . . . . . 45

*United States v. Yancey,*
    621 F.3d 681 (7th Cir. 2010) . . . . . . . . . . . . . . . . 18

*Statutes, Rules & Other Authorities:*

U.S. Const. Pmbl. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

U.S. Const. Art. I, § 2, Cl. 1 . . . . . . . . . . . . . . . . . . . 18

U.S. Const. amend. II. . . . . . . . . . . . . . . . . . . . . . . . . 14

U.S. Const. amend. V. . . . . . . . . . . . . . . . . . . . . . . . . 42

U.S. Const. amend. X. . . . . . . . . . . . . . . . . . . . . . . . . 18

U.S. Const. amend. XVII . . . . . . . . . . . . . . . . . . . . . 18

vii

PAGE

Act of Oct. 3, 1961, Pub. L. No. 87-342,
75 Stat. 757 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Gun Control Act of 1968, Pub. L. No. 90-618,
82 Stat. 1213 . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

18 U.S.C. § 922(g)(1) . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 922(g)(8) . . . . . . . . . . . . . . . . . . . . . . . . 8, 29

S. Rep. No. 90-1097 (1968). . . . . . . . . . . . . . . . . . . . 38

Act of Mar. 7, 1923, 1923 N.D. Laws . . . . . . . . . . . . 26

Act of May 4, 1923, 1923 N.H. Laws . . . . . . . . . . . . 26

Act of June 13, 1923, 1923 Cal. Stat. 696 . . . . . . . . 26

Act of Feb. 26, 1925, 1925 Or. Gen. Laws. . . . . . . . . 26

Act of Mar. 5, 1925, 1925 Nev. Laws . . . . . . . . . . . . 26

Act of Mar. 12, 1925, 1925 Ind. Laws . . . . . . . . . . . . 26

Act of Apr. 22, 1927, 1927 R.I. Acts & Resolves. . . . 25

Act of Apr. 29, 1925, 1925 Mass. Acts. . . . . . . . . . . . 26

Act of Apr. 27, 1927, 1927 Haw. Terr. Sess. Laws . . 25

Act of June 2, 1927, 1927 Mich. Acts . . . . . . . . . . . . 26

Act of June 10, 1931, 1931 Pa. Sess. Laws . . . . . . . 25

Act of June 19, 1931, 1931 Cal. Stat. 2316 . . . . . . . 26

Act of Mar. 23, 1935, 1935 Wash. Sess. Laws . . . . . 25

Act of Mar. 14, 1935, 1935 S.D. Sess. Laws . . . . . . 25

viii

PAGE

Act of Apr. 6, 1936, 1936 Ala. Gen. Laws ........ 25

Ala. Code § 13A-11-72(a)(1).................... 28

Alaska Stat. Ann. § 11.61.200(a)(1) ............. 27

Am. Samoa Code Ann. § 46.4221(b)(1) .......... 27

Ariz. Rev. Stat. Ann. § 13-904(A)(5) ............. 27

Ark. Code Ann. § 5-73-103(a)(1) ................ 27

Cal. Penal Code § 29800(a)(1) .................. 27

Colo. Rev. Stat. Ann. § 18-12-108(1)............. 27

Conn. Gen. Stat. § 53a-217(a) .................. 27

D.C. Code Ann. § 22-4503(a)(1)................. 27

Fla. Stat. Ann. § 790.23(1)..................... 27

Ga. Code Ann. § 16-11-131(b) .................. 27

10 Guam Code Ann. § 60108(b)(1)............... 27

Haw. Rev. Stat. § 134-7(b)..................... 27

Idaho Code Ann. § 18-310(2) ................... 28

Ind. Code Ann. § 35-47-2-3(i)(1) ............... 27

Iowa Code Ann. § 724.26(1)................... 27

Kan. Stat. Ann. § 21-6304(a)................... 28

Ky. Rev. Stat. Ann. § 527.040(1)............... 27

La. Stat. Ann. § 14:95.1(A) ................... 28

Md. Code Ann. Pub. Safety §§ 5-101(g)(2) ....... 27

ix

PAGE

Mass. Gen. Laws Ann. ch. 140 . . . . . . . . . . . . . . . . 27

Mich. Comp. Laws Ann. § 750.224f. . . . . . . . . . . . . 27

Minn. Stat. Ann. § 624.713 . . . . . . . . . . . . . . . . . . 27

Miss. Code Ann. § 97-37-5(1) . . . . . . . . . . . . . . . . . 27

Mo. Rev. Stat. § 571.070.1(1) . . . . . . . . . . . . . . . . . 27

Mont. Code Ann. § 45-8-313(1) . . . . . . . . . . . . . . . 28

Neb. Rev. Stat. Ann. § 28 . . . . . . . . . . . . . . . . . . . . 27

N.H. Rev. Stat. Ann. § 159:7 . . . . . . . . . . . . . . . . . 27

N.J. Stat. Ann. § 2C:58-3(c)(1) . . . . . . . . . . . . . . . . 27

N.M. Stat. Ann. § 30-7-16(A) . . . . . . . . . . . . . . . . . 27

N.Y. Penal Law § 400.00(1)(c) . . . . . . . . . . . . . . . . 27

N.C. Gen. Stat. Ann. § 14-415(b)(5) . . . . . . . . . . . . 27

N.D. Cent. Code Ann. § 62.1-2-1(1)(b). . . . . . . . . . . 27

6 N. Mar. I. Code § 10610(a)(3) . . . . . . . . . . . . . . . 27

Ohio Rev. Code Ann. § 2923.13(A)(2)-(3) . . . . . . . . . 28

Okla. Stat. Ann. tit. 21, § 1283(A). . . . . . . . . . . . . . 27

Or. Rev. Stat. Ann. § 166.270(1) . . . . . . . . . . . . . . . 27

18 Pa. Stat. & Cons. Stat. Ann. § 6105(a)(1)
    and (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

P.R. Laws Ann. tit. 25, § 462a(a)(2) . . . . . . . . . . . . 27

47 R.I. Gen. Laws Ann. § 11-47-5(a)(1). . . . . . . . . . . 28

x

PAGE

S.C. Code Ann. § 16-23-30(A)(1) . . . . . . . . . . . . . . . . 28

S.D. Codified Laws § 22-14-15. . . . . . . . . . . . . . . . . . 28

Tenn. Code Ann. § 39-17-1307(c). . . . . . . . . . . . . . . 28

Tex. Penal Code Ann. § 46.04(a) . . . . . . . . . . . . . . . 28

Utah Code Ann. § 76-10-503(1) . . . . . . . . . . . . . . . . 28

13 Vt. Stat. Ann. § 4017(a) . . . . . . . . . . . . . . . . . . . 28

Va. Code Ann. § 18.2-308.2(A)(i) . . . . . . . . . . . . . . . 28

V.I. Code Ann. tit. 23, § 456a(a)(1) . . . . . . . . . . . . . 28

Wash. Rev. Code Ann. § 9.41.040(2)(a)(i)(A) . . . . . . 28

W. Va. Code Ann. § 61-7-7(a)(1) . . . . . . . . . . . . . . . 28

Wis. Stat. Ann. § 941.29(1m)(a)-(b). . . . . . . . . . . . . 29

Wyo. Stat. Ann. § 6-8-102(c) . . . . . . . . . . . . . . . . . . 29

5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* (1886). . . . . . 34

*Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776* (1777) . . . . . . . . . . . . . . . . . . . . . . . 34

2 *The Documentary History of the Ratification of the Constitution* (Merrill Jensen ed., 1976). . . . . . . . 25

The Federalist No. 74 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Journal of the Provincial Congress of South Carolina, 1776* (1776) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

4 *Journals of the Continental Congress 1774-1789* (1906) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

1 *Journals of the Provincial Congress, Provincial Convention, Committee of Safety and Council of Safety of the State of New-York* (1842) . . . . . . . . 33

*The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780* (Oscar Handlin & Mary Handlin eds., 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

1 *The Public Acts of the General Assembly of North Carolina* (1804) . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*The Public Records of the Colony of Connecticut From May, 1775 to June, 1776* (Charles J. Hoadly ed., 1890) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 33

*Records of the Colony of Rhode Island and Providence Plantations in New England* (1862) . . . . . . . . . . 34

9 *The Statutes at Large of Pennsylvania from 1682 to 1801* (1903) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

9 *The Statutes at Large; Being a Collection of All the Laws of Virginia* (1821) . . . . . . . . . . . . . . . . . . . 34

3 *The Writings of George Washington* (Worthington Chauncey Ford ed., 1889). . . . . . . . . . . . . . . . . . 34

1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* (1688) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Akhil Reed Amar, *The Bill of Rights* (1998). . . . 17, 36

xii

PAGE

4 William Blackstone, *Commentaries on the Laws of England* (1769) . . . . . . . . . . . . . . . . . . . . . . . . 21, 24

Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277 (2014) . . . . . . . . . . . . . . . . 22

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (1868) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 36

Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020) . . . . . . . . . . . 32

Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

David Thomas Koning, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354 (1982) . . . . . 24

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* (1971) . . . . . . . . . . . . . 35, 36

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 23-8096

———————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

JONATHAN DAVILA,

*Defendant-Appellant.*

———————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————

### Preliminary Statement

Jonathan Davila appeals from a judgment of conviction entered on December 20, 2023, in the United States District Court for the Southern District of New York, by the Honorable Jed S. Rakoff, United States District Judge, following Davila's guilty plea to possessing a firearm after a felony conviction.

Indictment 23 Cr. 292 (JSR) (the "Indictment") was filed on June 14, 2023. It charged Davila in one count with possessing a firearm after having previously been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1).

2

On September 18, 2023, Davila pleaded guilty to Count One of the Indictment. On December 18, 2023, Judge Rakoff sentenced Davila to 42 months' imprisonment, to be followed by three years of supervised release, and imposed a $100 mandatory special assessment.

Davila is serving his sentence.

## Statement of Facts

### A. The Offense Conduct

On April 17, 2023, a New York City Police Department officer received a call from a woman reporting that a man had menaced her with a gun in the Bronx, New York, after a dispute about a parking space. (PSR ¶¶ 9, 43).[1] When NYPD officers responded to the scene, they encountered Davila, who matched the description provided by the 911 caller of the man who had menaced her. (PSR ¶ 9). Davila fled from law enforcement officers, who gave chase. (PSR ¶ 10). During the chase, Davila fell to the ground and dropped a loaded .22 caliber Phoenix Arms pistol. (PSR ¶¶ 9-10).

---

[1] "PSR" refers to the Presentence Investigation Report prepared by the United States Probation Office ("Probation Office") in connection with Davila's sentencing; "Br." refers to Davila's brief on appeal; "A." refers to the appendix filed with that brief; and "Dkt." refers to entries on the District Court's docket. Unless otherwise noted, case text quotations omit all internal quotation marks, citations, footnotes, and previous alterations.

3

At the time, Davila had prior felony convictions, including for manslaughter in the first degree, assault, and the sale of a controlled substance. (PSR ¶¶ 8, 35, 36).

## B.   The Charge and Guilty Plea

A federal complaint was filed against Davila on May 31, 2023, charging him with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (Dkt. 1). Davila was arrested the following day. (A. 2). The indictment was filed on June 14, 2023, charging Davila with the same single count. (PSR ¶ 1).

On July 21, 2023, Davila moved to dismiss the Indictment on the ground that the federal felon-in-possession statute violates the Second Amendment. (Dkt. 12). Judge Rakoff denied the motion in a written opinion on August 22, 2023. (A. 8-20).

On September 18, 2023, Davila pleaded guilty, without a plea agreement, to the sole count of the Indictment. (PSR ¶ 4).

Before Davila entered his plea, the Government provided him with a letter pursuant to this Court's suggestion in *United States v. Pimentel*, 932 F.2d 1029, 1034 (2d Cir. 1991), setting forth the Government's position regarding the application of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") to Davila's case. (PSR ¶ 5). The *Pimentel* letter estimated that, assuming Davila pleaded guilty and accepted responsibility, his advisory sentencing range under the Guidelines would be 57 to 71 months' imprisonment. (PSR ¶ 5). The Government calculated that Davila's base offense level was 24 under U.S.S.G. § 2K2.1(a)(2)

4

because Davila possessed a firearm after sustaining at least two felony convictions for crimes of violence, namely assault in the second degree and manslaughter in the first degree. (PSR ¶ 19). Assuming Davila accepted responsibility for his crime and received a three-level reduction under U.S.S.G. § 3E1.1, his total offense level would be 21. The *Pimentel* letter specified that Davila was in Criminal History Category IV based on his eight criminal history points.

## C. The Presentence Report and Davila's Sentencing

The Probation Office's Presentence Report agreed with the *Pimentel* letter that Davila's base offense level was 24 under U.S.S.G. § 2K2.1(a)(2) because Davila had two prior felony convictions for crimes of violence. (PSR ¶ 5). Specifically, Davila had prior convictions for (1) assault in the second degree, in violation of New York Penal Law § 120.05; and (2) manslaughter in the first degree, in violation of New York Penal Law § 125.20. (PSR ¶¶ 5, 19). Like the *Pimentel* letter, the Presentence Report calculated a total offense level of 21 after accounting for a three-level reduction for Davila's acceptance of responsibility. (PSR ¶¶ 26-27). Unlike the *Pimentel* letter, the Presentence Report calculated that Davila had six criminal history points and a Criminal History Category of III. (PSR ¶ 39). In light of recent amendments to the Guidelines, the Government agreed that Davila no longer received a two-level enhancement for committing the crime while under a criminal justice sentence. (Dkt. 21).

5

The Presentence Report calculated a Guidelines range of 46 to 57 months' imprisonment, which the Government agreed was correct. (PSR ¶ 62; Dkt. 21).

On December 18, 2023, Davila appeared before Judge Rakoff for sentencing. Judge Rakoff adopted the Guidelines calculation in the Presentence Report and sentenced Davila principally to a below-Guidelines sentence of 42 months' imprisonment. (A. 22, 33).

# A R G U M E N T

## Section 922(g)(1) is Constitutional

Davila argues that the felon-in-possession statute, 18 U.S.C. § 922(g)(1), violates his Second Amendment right to bear arms. That claim, based on *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), is meritless. Section 922(g)(1) is constitutional under Supreme Court and Second Circuit precedents, which have consistently recognized that laws prohibiting the possession of firearms by convicted felons are permissible under the Second Amendment. The Supreme Court's decision in *Bruen*, on which Davila relies, did not disturb this settled understanding, and the Supreme Court's recent decision in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), again reiterated that prohibitions on possession of firearms by convicted felons are "presumptively lawful." *Id.* at 1902. This principle is firmly grounded in the text of the Constitution and the Nation's "historical tradition of firearm regulation." *Id.* at 1897. Felons are not among the law-abiding citizens protected by the Second Amendment, there is abundant historical evidence supporting laws disarming

6

felons and, more generally, laws disarming categories of persons when Congress determines they pose a risk of danger. Thus, Judge Rakoff committed no error in concluding that Section 922(g)(1) is constitutional.

## A. Applicable Law

### 1. The Second Amendment and Prohibitions on Felons Possessing Firearms

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. At the same time, the Court emphasized that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," among other regulations. *Id.* at 626-27; *see also id.* at 631 ("Before this Court petitioners have stated that 'if the handgun ban is struck down and respondent registers a handgun, he could obtain a license, assuming he is not otherwise disqualified,' by which they apparently mean if he is not a felon and is not insane."). Two years later, the Court "repeat[ed] th[e] assurances" that it had "made ... clear in *Heller*": its holding "did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons," among others. *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality).

Following *Heller* and *McDonald*, the federal courts of appeals, including this Court, uniformly rejected Second Amendment challenges to Section 922(g)(1), which prohibits the possession of firearms and

7

ammunition by convicted felons. *E.g.*, *United States v. Bogle*, 717 F.3d 281, 281-82 (2d Cir. 2013) (per curiam) (joining "every other circuit to consider the issue" in holding that Section 922(g)(1) is constitutional after *Heller* and *McDonald*). While several circuits utilized a so-called "two-step," or "means-end" test in evaluating the constitutionality of Section 922(g)(1), *see, e.g.*, *Kanter v. Barr*, 919 F.3d 437, 445–47 (7th Cir. 2019), this Court did not; instead, this Court explicitly relied on the mandate of *Heller* and *McDonald* to find Section 922(g)(1) constitutional, *Bogle*, 717 F.3d at 281.

## 2.  *Bruen* and *Rahimi*

As courts applied *Heller* and *McDonald*, different methodological approaches emerged. In some cases, courts rejected Second Amendment claims based on the Supreme Court's reassurances in *Heller* and *McDonald* regarding the lawfulness of certain regulations. *See, e.g.*, *Bogle*, 717 F.3d at 281-82 (rejecting challenge to Section 922(g)(1)). In other cases, courts "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny," *i.e.*, whether "the regulation promotes an important [governmental] interest." *Bruen*, 597 U.S. at 17; *see, e.g.*, *United States v. Perez*, 6 F.4th 448, 453-56 (2d Cir. 2021) (rejecting challenge to 18 U.S.C. § 922(g)(5)).

*Bruen* considered a New York State law that provided for a discretionary "proper cause" licensing regime to carry a firearm outside the home, which this Court had upheld using the means-end framework. 597 U.S. at 12, 16-17. The Supreme Court reversed,

8

rejecting the means-end test, *see id.* at 17-19, and reaffirming "*Heller*'s methodology centered on constitutional text and history," *id.* at 22. Thus, "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

In *Rahimi*, the Supreme Court applied this methodology to 18 U.S.C. § 922(g)(8), which prohibits possession of a firearm while subject to a domestic-violence restraining order, and held that Section 922(g)(8) does not violate the Second Amendment. 144 S. Ct. at 1896-97. In reaching that conclusion, *Rahimi* explained that "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition" and ascertaining "whether the new law is relevantly similar to laws that our tradition is understood to permit." *Id.* at 1898 (emphasis added). The Supreme Court further emphasized that even "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Id.* (quoting *Bruen*, 597 U.S. at 30). The law "need not be a 'dead ringer' or a 'historical twin.'" *Id.* (quoting *Bruen*, 597 U.S. at 30).

Where, as here, the appellant raised his constitutional challenge below, this Court "review[s] de novo a district court's determination that the application of a

9

law does not violate the Second Amendment." *United States v. Jimenez*, 895 F.3d 228, 232 (2d Cir. 2018).

## B. Discussion

### 1. *Bogle*'s Holding that Section 922(g)(1) Is Constitutional Remains Good Law and Forecloses Davila's Argument

In the last decade-and-a-half, the Supreme Court has reiterated, time and again, that its decisions interpreting the Second Amendment "d[o] not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *McDonald*, 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626 (2008)); *Bruen*, 597 U.S. at 81 (Kavanaugh, J., joined by Roberts, C.J., concurring) (confirming that *Bruen* should not be interpreted to cast doubt on the "longstanding prohibitions on the possession of firearms by felons" blessed in *Heller* and *McDonald*); *id.* at 72 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* or *McDonald* … about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 129 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) ("I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding" permitting felons to be prohibited from possessing firearms). In *Rahimi*, the Court again repeated this admonition, stating that "prohibitions, like those on the possession of firearms by felons

10

and the mentally ill, are presumptively lawful." 144 S. Ct. at 1902.[2]

After *Heller* and *McDonald*, but before *Bruen* and *Rahimi*, this Court held that "§ 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons." *Bogle*, 717 F.3d at 281-82. This Court's reasoning in *Bogle* was based on the Supreme Court's "emphasi[s] that recent developments in Second Amendment jurisprudence should not 'be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons,'" *Id.* (quoting *Heller*, 554 U.S. at 626, and citing *McDonald*, 561 U.S. at 786).

Nothing in the Supreme Court's case law since *Bogle* in any way abrogates this Court's holding. On the contrary, in reaffirming that prohibitions on felon firearm possession are "presumptively lawful," the Supreme Court's *Rahimi* decision provides further support for *Bogle*'s holding. *Bogle*'s still-binding holding

––––––––––

[2] In addition, just two years before *Bruen*, Justice Thomas agreed that *Heller* and *McDonald* "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals." *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 590 U.S. 336, 364 (2020) (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting). Thus, every single member of both the *Bruen* and *Rahimi* Courts has explicitly approved of *Heller*'s and *McDonald*'s reassurances regarding felon-in-possession statutes.

11

that Section 922(g)(1) is constitutional forecloses Davila's argument that Section 922(g)(1) is unconstitutional as applied to him, a person with multiple prior felony convictions.

Nor did *Bruen* abrogate *Bogle*. *Bogle* did not employ the means-end test later disapproved in *Bruen*; instead, this Court applied the reassurances of *Heller* and *McDonald* regarding the validity of "'longstanding prohibitions on the possession of firearms by felons.'" *Bogle*, 717 F.3d at 281 (quoting *Heller*, 554 U.S. at 626). As the Supreme Court has repeatedly explained, including in *Bruen* itself, the reassurances in *Heller* and *McDonald* are supported by history. *See Bruen*, 597 U.S. at 21 (explaining that *Heller* "relied on the historical understanding of the [Second] Amendment to demark the limits on the exercise of that right"); *Heller*, 554 U.S. at 626, 635 (acknowledging that "permissible" regulations, including the "longstanding prohibitions on the possession of firearms by felons," were supported by "historical analysis" and "historical justifications"). It would therefore make little sense to conclude that *Bruen* meant, *sub silentio*, to discard *Heller*'s and *McDonald*'s admonitions that felon disarmament is consistent with the Second Amendment. *See Heller*, 554 U.S. at 626, 631; *McDonald*, 561 U.S. at 786. And that is all the more clear in light of *Rahimi*, which repeated those admonitions. *See Rahimi*, 144 S. Ct. at 1902.[3]

---

[3] The Supreme Court's reassurances in *Heller*, *McDonald*, and *Rahimi*—which were express limitations of its own opinions—were not dicta. Rather, they

12

Accordingly, there have been no intervening Supreme Court decisions that undercut *Bogle*. On the contrary, the Supreme Court's cases since *Bogle* serve to strengthen *Bogle*, not overrule it. First, the *Bruen* decision counseled courts to follow *Heller* and *McDonald* more closely, rather than devising a new means-ends doctrine. That holding effectively reaffirmed *Bogle*, which drew directly from *Heller* and *McDonald* and did not rely on means-ends reasoning. Then, the *Rahimi* decision reiterated the same language from *Heller* and *McDonald* that *Bogle* cited as the basis for its holding. In short, far from overruling *Bogle*, the Supreme Court's cases have provided further support for it, and thus *Bogle* remains good law. *See, e.g.*, *United States v. Peguero*, 34 F.4th 143, 158 (2d Cir. 2022) ("It is a longstanding rule that a panel of our Court is

—————

are necessary to understand the scope of the Court's holding in those cases. And even if these statements were dicta, they must still "be given considerable weight and [cannot] be ignored in the resolution of the" issue before this Court. *United States v. Bell*, 524 F.2d 202, 206 (2d Cir. 1975); *see also, e.g.*, *United States v. Colasuonno*, 697 F.3d 164, 178-79 (2d Cir. 2012) (acknowledging that it is the "usual obligation to accord great deference to Supreme Court *dicta*" except in certain circumstances, such as when Congress has "removed or weakened the conceptual underpinnings" of a decision). In any event, when this Court adopted the reassurances of *Heller* and *McDonald* as the core basis of its holding in *Bogle*, those reassurances became binding in this Circuit.

13

bound by the decisions of prior panels until such times as they are overruled either by an en banc panel of our Court or by the Supreme Court."). This binding circuit precedent defeats Davila's challenge to Section 922(g)(1).[4]

## 2. Text and History Confirm that Section 922(g)(1) Is Constitutional

Even if this Court were to ignore *Bogle* and consider the constitutionality of Section 922(g)(1) anew, the text and historical context of the Second Amendment make clear that Section 922(g)(1) is constitutional as applied to Davila. This is for three reasons. First, as a felon, Davila is not among the "people" entitled to Second Amendment rights. Second, even if he were, laws prohibiting felon possession of firearms are supported by "the Nation's historical tradition of firearm regulation." *Rahimi*, 144 S. Ct. at 1896. Third, the nation's "tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others," and Congress has reasonably determined that individuals with

---

[4] Davila ignores *Bogle* entirely. But this Court's repeated rejections of challenges to Section 922(g)(1) on plain error review belie any suggestion that *Bruen* superseded *Bogle*. Such cases recognize that there is no precedent that is inconsistent with *Bogle*'s holding. *See, e.g.*, *United States v. Ogidi*, No. 23-6325, 2024 WL 2764138, at *1 (2d Cir. May 30, 2024) ("At this time, no binding precedent holds that § 922(g)(1) is unconstitutional.").

14

felony convictions like Davila pose such a threat. *Id.* at 1902.

### a. The Second Amendment's Text and Historical Context Demonstrate that Davila, a Convicted Felon, Is Not Among "the People" Entitled to Second Amendment Rights

Felon-disarmament laws are consistent with the Second Amendment's text, as historically understood. The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Contrary to Davila's argument (Br. at 5-7), felons, like Davila, do not fall within "the people" protected by the Second Amendment, and "the right . . . to keep and bear Arms" is not "infringed" by longstanding laws prohibiting felons from possessing firearms due to their convictions.

Where the validity of a restriction is challenged, a court looks to "constitutional text and history," and examines the "historical tradition of firearm regulation." *Rahimi*, 144 S. Ct. at 1897. As a matter of both text and history, the Second Amendment does not prevent legislatures from prohibiting firearm possession by those who have demonstrated disregard for the rule of law through the commission of felony offenses—a conclusion reached by multiple Courts of Appeals. *See United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. 2023) (concluding that "legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms" and that

15

"Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons"), *cert. granted*, *judgment vacated*, No. 23-6170, 2024 WL 3259675 (U.S. July 2, 2024);[5] *Medina v. Whitaker*, 913 F.3d 152, 157-61 (D.C. Cir. 2019) ("hold[ing] that those convicted of felonies are not among those entitled to possess arms" and "reject[ing] the argument that non-dangerous felons have a right to bear arms" based on "tradition and history," making it unnecessary to "reach the second"—now abrogated—"step" of that court's pre-*Bruen* precedent); *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017) (holding that "conviction of a felony necessarily removes one from the class of 'law-abiding, responsible citizens' for the purposes of the Second Amendment"); *Range v. Attorney General*, 53 F.4th 262, 266 (3d Cir. 2022) (per curiam) ("*Range I*") (holding that "those who have demonstrated disregard for the rule of law through the commission of felony and felony-equivalent offenses" can be prohibited from possessing firearms consistent with the Second Amendment's text and history, "whether or not those crimes are violent"),

---

[5] Shortly after deciding *Rahimi*, the Supreme Court granted, vacated, and remanded several decisions in Section 922(g)(1) cases, including *Jackson*. In employing this procedure, the Court expressed no view on the merits of those petitions for certiorari. *See, e.g.*, *Tyler v. Cain*, 533 U.S. 656, 666 n.6 (2001). Accordingly, such vacatur does not diminish the persuasive force of *Jackson*—particularly with respect to its discussion of the historical record.

16

*vacated upon grant of rehearing en banc*, 56 F.4th 992 (3d Cir. 2023).[6]

The Second Amendment's protections extend to "ordinary, law-abiding, adult citizens," *Bruen*, 597 U.S. at 31-32, who are entitled to be "members of the political community," *Heller*, 554 U.S. at 580. Section 922(g)(1)'s status-based restriction on who can possess firearms reflects a longstanding recognition that individuals who commit crimes punishable by more than one year of imprisonment do not fit those criteria. Consistent with that understanding, legislatures historically have had wide latitude to exclude felons from the political community as a consequence of their convictions. As Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitations," *Heller*, 554 U.S. at 616, "the *people* in whom is vested the sovereignty of the State … cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds," Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868). Felons could therefore historically be excluded from "exercis[ing] the

───────────

6   The en banc Third Circuit vacated the panel opinion in *Range* and ultimately reached a contrary result, but the Supreme Court then vacated and remanded the Third Circuit's en banc decision after *Rahimi. See Garland v. Range*, No. 23-374, 2024 WL 3259661 (U.S. July 2, 2024). The original panel opinion retains its persuasive value.

17

elective franchise," *id.* at 29, as well as from other, closely related "political rights"—including the rights to "hold public office," to "serve on juries," and, most relevant here, "to bear arms," Akhil Reed Amar, *The Bill of Rights* 48 & n.* (1998) (explaining that these were all historically understood as "political rights" and that in particular, "arms bearing and suffrage were intimately linked [in the late eighteenth century] and have remained so").

Today, felony conviction still result in the "forfeiture of a number of rights" tied to membership in the political community, including not just the right to bear arms but also "the right to serve on a jury and the fundamental right to vote." *Medina*, 913 F.3d at 160 (citing 28 U.S.C. § 1865(b)(5) (barring convicted felons from serving on a federal jury); *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974) (upholding state felon disenfranchisement)); *see also Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (noting that consequences of a felony conviction can include deprivation of the right to hold office).

Just as Congress and the States have required convicted felons to forfeit other rights belonging to members of the political community, Section 922(g)(1) accords with the historical meaning of the Second Amendment by imposing a firearms-related disability "as a legitimate consequence of a felony conviction," *Tyler v. Hillsdale County Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring in most of the judgment). While "[t]he Second Amendment establishes a fundamental right for American citizens to possess a gun," the decision in "*Heller*

18

recognizes an exception for some Americans—to respect 'longstanding prohibitions on the possession of firearms by felons and the mentally ill,'" exceptions that are "historically grounded and sensible." *Id.* (quoting *Heller*, 554 U.S. at 626-28); *see also, e.g.*, *United States v. Carpio-Leon*, 701 F.3d 974, 979-80 (4th Cir. 2012); *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011); *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010).

Davila argues that the phrase "the people," as used in the Second Amendment, must have the same meaning wherever it appears in the Constitution (Br. 5-6), but that argument is unpersuasive. While "the people" refers to members of the political community throughout the Constitution, *see Heller*, 554 U.S. at 580, the scope of that community varies from provision to provision. For example, noncitizens are not among "the people" protected by the Second Amendment, *see id.* at 581; *Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment), but certain noncitizens are among "the people" protected by the Fourth Amendment, *see United States v. Verdugo-Urquidez*, 494 U.S. 259, 265, 271-73 (1990). The same is true of felons. And many other constitutional provisions use "the people" in a manner that excludes felons who have forfeited the rights that come with membership in the polity. Such felons are not among "the people" who adopted the Constitution, *see* U.S. Const. Pmbl; or "the people" who are entitled to elect members of Congress, *see* U.S. Const. Art. I, § 2, Cl. 1; amend. XVII, Cls. 1-2; or "the people" who reserved powers not delegated to the government, *see* U.S. Const. amend. X. So too, felons

19

disarmed under Section 922(g)(1) are not among "the people" entitled to keep and bear arms.

*Bruen* makes plain that those who are not law-abiding citizens cannot successfully challenge laws that apply to them based on that status. The Supreme Court made "repeated statements in *Bruen* that the Second Amendment protects the right of a 'law-abiding citizen' to keep and bear arms." *Jackson*, 69 F.4th at 503 (collecting citations); *see also Range I*, 53 F.4th at 271 (observing that the *Bruen* "majority characterized the holders of Second Amendment rights as 'law-abiding' citizens no fewer than fourteen times"). In one passage, the Court connected its explanation that the plaintiffs were "part of 'the people' whom the Second Amendment protects" with its observation that they were "ordinary, law-abiding, adult citizens." *Bruen*, 597 U.S. at 31-32. And *Bruen* explained that the historical analysis focuses on "how and why" a challenged regulation and a potential analogue "burden a *law-abiding* citizen's right to armed self-defense." *Id.* at 29 (emphasis added). Applying that historical test as the Supreme Court has described it would be superfluous where, as here, the challenged law applies only to those who are not law-abiding—and thus does not impose *any* "burden" on "a law-abiding citizen's right to armed self-defense." *Id.*

Interpreting "the people" in the Second Amendment not to include felons also accords with the Supreme Court's specific assurances that prohibiting possession of firearms by felons is permissible. *See Rahimi*, 144 S. Ct. at 1902; *Heller*, 554 U.S. at 626-27, 627 n.26, 635.

20

*Heller* parsed the text of the Second Amendment and recognized that the plaintiff would be entitled to keep a handgun in his home "[a]ssuming that [he] is not disqualified from the exercise of Second Amendment rights." *Id.* at 635. Davila, by contrast, is a felon and therefore is "disqualified from the exercise of Second Amendment rights." *Id.*; *see also id.* at 631 (explaining that the District of Columbia had "apparently" used the word "disqualified" to "mean if [the plaintiff] is not a felon and is not insane").

This Court has recognized the same limitation on the Second Amendment's scope in the context of challenges to other regulations: "As to the first step of the analysis, [this Court] ha[s] interpreted the core Second Amendment right identified in *Heller* to be the right of *law-abiding, responsible citizens.*" *Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106, 127 (2d Cir. 2020) (emphasis in original), *abrogated on other grounds by Bruen*, 597 U.S. 1;[7] *accord, e.g.*, *United States v.*

---

[7] In *Rahimi*, the Supreme Court disapproved of the use of the word "responsible" as a basis for finding a person to be outside the scope of the Second Amendment. 144 S. Ct. at 1903 ("'Responsible' is a vague term."). But the Court did not indicate any disagreement with the view that the Second Amendment only extends to "law-abiding citizens," a formulation that the Supreme Court and this Court have used frequently when discussing the scope of the Second Amendment right. The word "law-abiding" to refer to persons without felony convictions does not implicate any vagueness concerns, and this reading is supported

21

*Decastro*, 682 F.3d 160, 166 (2d Cir. 2012) (framing inquiry as whether and to what extent challenged prohibition burdens "the ability of *law-abiding citizens* to possess and use a firearm for self-defense (or for other lawful purposes)" (emphasis added)). And in *Bogle*, of course, this Court rejected a facial challenge to Section 922(g)(1) based upon *Heller*'s and *McDonald*'s reassurances grounded in history. Laws such as Section 922(g)(1) are therefore constitutional under the Second Amendment's text as informed by a variety of "historical justifications." *Heller*, 554 U.S. at 635.

### b. The Nation's Historical Tradition of Firearms Regulation Supports the Constitutionality of Felon Disarmament Laws

Even if Davila, as a felon, is considered part of "the people" entitled to Second Amendment rights, a review of "this Nation's historical tradition of firearm regulation," *Rahimi*, 144 S. Ct. at 1896, confirms the validity of laws disarming people because of felony convictions, regardless of the specific nature of the felonies.

In England before the Founding, felons had no right to keep and bear arms. The standard penalty for a felony was death. *See* 4 William Blackstone, *Commentaries on the Laws of England* 98 (1769). That punishment extended even to non-violent felonies, such as smuggling, *id.* at 155; fraudulent bankruptcy, *id.* at

—————

both by historical tradition and by the Supreme Court's repeated statements that felon disarmament laws are constitutionally permissible.

22

156; violating quarantine, *id.* at 162; forging a mar-
riage license, *id.* at 163; and cutting down a cherry
tree, *id.* at 4. A felon awaiting execution would be held
in prison—where he would have no access to arms. *See
id.* at 131 (discussing a statute making it unlawful to
provide "any arms" to a "prisoner in custody for trea-
son or felony"). A conviction would also usually result
in the escheat of the felon's estate and the forfeiture of
all his goods and chattels—including, of course, his
arms. *See id.* at 379-82. A convicted felon, finally, was
deemed "already dead in law" even before his execu-
tion. *Id.* at 374. That status, known as "civil death,"
involved "an extinction of civil rights, more or less com-
plete." *Avery v. Everett*, 18 N.E. 148, 150 (N.Y. 1888).
A convicted felon thus had no "right to vote, to sit as a
juror, to bear arms, to marry"; indeed, "his physical
conditions were such that he could do none of these
things." *Id.* at 156 (Earl, J., dissenting) (emphasis
added).

Early Americans accepted that legislatures had the
power to subject felons to similar deprivations. Thus,
"death was 'the standard penalty for all serious crimes'
at the time of the founding." *Bucklew v. Precythe*, 587
U.S. 119, 129 (2019); *accord Baze v. Rees*, 553 U.S. 35,
94 (2008) (Thomas, J., joined by Scalia, J., concurring
in the judgment) (noting that capital punishment for
felonies was "ubiquit[ous]" in the late eighteenth cen-
tury and was "the standard penalty for all serious
crimes"). As in England, the death penalty extended
even to non-violent crimes, such as forgery and horse
theft. *See Medina*, 913 F.3d at 158. Many States also
subjected certain felons to forfeiture of their estates or
their goods and chattels. *See* Beth A. Colgan, *Reviving*

23

*the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 nn. 275-276 (2014) (collecting statutes). And at least some States enacted statutes carrying forward the common-law doctrine of civil death. *See, e.g.*, *In re Deming*, 10 Johns. 232, 233 (N.Y. 1813) (per curiam).

As the D.C. Circuit has observed, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158. And the Supreme Court adopted similar reasoning in *Rahimi*, in its discussion of "going armed laws," which allowed for the imprisonment of those who had "disrupted the public order" by going armed in public. 144 S. Ct. at 1901. The Supreme Court reasoned that "if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." *Id.* at 1902. Likewise, here, where the historical evidence shows that the Founding generation understood that convicted felons could be subjected to the greater penalties of death or estate forfeiture, then they would also have viewed the lesser restriction of lifetime disarmament as permissible.

Because the traditional punishment for serious crimes was death, early legislatures had little occasion to enact laws explicitly disarming those convicted of such crimes. They did, however, enact laws disarming people who had committed certain offenses that were not punishable by death. For example, an English statute provided that a person could not "keep arms" if he had been "convicted in a court of law of not attending

24

the service of the church of England." 4 Blackstone 55; *see* 3 Jac. 1, c. 5, § 16 (1605) (Eng.). In 1624, Virginia punished a person for "base" and "opprobrious" speech by ordering him "disarmed" and declaring him ineligible to exercise "any priviledge or freedom" in the colony. David Thomas Koning, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354, 371 (1982). And a 1775 Connecticut statute provided that anyone convicted of "libel[ing] or defam[ing]" certain colonial resolutions "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 193 (Charles J. Hoadly ed., 1890). That legislatures disarmed people who had committed those minor offenses suggests, *a fortiori*, the constitutionality of disarming those who commit felonies.

Moreover, some Founding Era sources expressly recognized that the right to bear arms extended only to law-abiding individuals. In 1780, for example, the Town of Williamsburg, Massachusetts, adopted a resolution proclaiming: "we esteem it an essential priviledge to keep Arms in Our houses for Our Own Defence and while we Continue honest and Lawfull Subjects of Government we Ought Never to be deprived of them." The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780, at 624 (Oscar Handlin & Mary Handlin eds., 1966).

The Founders also understood that the precise type of regulation challenged here is constitutional. As a prominent early example of this, anti-Federalists at the Pennsylvania ratifying convention proposed a bill

of rights that, among other things, forbade "disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals." 2 The Documentary History of the Ratification of the Constitution 598 (Merrill Jensen ed., 1976).

Post-ratification history also supports the conclusion that felon-disarmament laws like Section 922(g)(1) are sufficiently "longstanding" to form part of the Nation's tradition of gun regulation. *Heller*, 554 U.S. at 626. The United States has a century-old tradition of disarming *violent* criminals (regardless of whether their crimes constitute felonies). In the 1920s and 1930s, multiple jurisdictions began prohibiting anyone with a conviction for a "crime of violence" from possessing a handgun.[8] In 1932, Congress adopted a similar prohibition for the District of Columbia. *See* District of Columbia Dangerous Weapons Act, § 3, 47 Stat. 650, 651. And in 1938, Congress enacted a nationwide prohibition on the receipt of a firearm by anyone with a conviction for a crime of violence. *See* Federal Firearms Act, ch. 850, § 2(d), 52 Stat. 1250, 1251 (1938).

---

[8]  *See* Act of Apr. 22, 1927, ch. 1052, § 3, 1927 R.I. Acts & Resolves 257; Act of Apr. 27, 1927, No. 206, § 4, 1927 Haw. Terr. Sess. Laws 209; Act of June 10, 1931, No. 158, § 4, 1931 Pa. Sess. Laws 498; Act of Mar. 14, 1935, ch. 208 § 4, 1935 S.D. Sess. Laws 355; Act of Mar. 23, 1935, ch. 172, § 4, 1935 Wash. Sess. Laws 599; Act of Apr. 6, 1936, No. 82, § 4, 1936 Ala. Gen. Laws 51.

26

The United States also has a century-old tradition of disarming convicted *felons* (regardless of whether their crimes are violent). In the 1920s and 1930s, legislatures began to prohibit the possession of handguns by those who had been convicted of felonies against person or property (a category that included nonviolent property crimes such as theft).[9] At around the same time, other legislatures began to prohibit the possession or purchase of handguns by felons in general.[10] Congress followed the latter model in 1961, when it forbade the receipt of a firearm by anyone convicted of a crime punishable by more than a year of imprisonment. *See* Act of Oct. 3, 1961, Pub. L. No. 87-342, §2, 75 Stat. 757. And in 1968, Congress enacted Section 922(g)(1), broadening that prohibition to cover possession as well as receipt. *See* Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1220.

Today, at the federal level, Section 922(g)(1) is by far the most commonly applied firearm

———————

[9] *See* Act of Mar. 7, 1923, ch. 266, § 5, 1923 N.D. Laws 380; Act of May 4, 1923, ch. 119, § 3, 1923 N.H. Laws 138; Act of June 13, 1923, ch. 339, § 2, 1923 Cal. Stat. 696; Act of Feb. 26, 1925, ch. 260, § 2, 1925 Or. Gen. Laws 468; Act of Mar. 12, 1925, ch. 207, § 4, 1925 Ind. Laws 495-96.

[10] *See* Act of Mar. 5, 1925, ch. 47, § 2, 1925 Nev. Laws 54; Act of Apr. 29, 1925, ch. 284, § 4, 1925 Mass. Acts 323; Act of June 2, 1927, No. 373, § 2, 1927 Mich. Acts 887-888; Act of June 19, 1931, ch. 1098, § 2, 1931 Cal. Stat. 2316.

27

disqualification in Section 922(g). In addition, every single State and territory has enacted some form of felon-disarmament law—*i.e.*, a law that disqualifies individuals from possessing, carrying, or buying firearms because of felony convictions. Thirty-nine States, the District of Columbia, and five territories, have enacted felon-disarmament laws that cover felony convictions in general.[11] Felon-disarmament laws in the

_____

[11] *See* Alaska Stat. Ann. § 11.61.200(a)(1); Am. Samoa Code Ann. § 46.4221(b)(1); Ariz. Rev. Stat. Ann. § 13-904(A)(5); Ark. Code Ann. § 5-73-103(a)(1); Cal. Penal Code § 29800(a)(1); Colo. Rev. Stat. Ann. § 18-12-108(1); Conn. Gen. Stat. § 53a-217(a); Del. Code Ann. tit. 11, § 1448(a)(1); D.C. Code Ann. § 22-4503(a)(1); Fla. Stat. Ann. § 790.23(1); Ga. Code Ann. § 16-11-131(b); Haw. Rev. Stat. § 134-7(b); 10 Guam Code Ann. § 60108(b)(1); 720 Ill. Comp. Stat. 5/24-1.1(a); Ind. Code Ann. § 35-47-2-3(i)(1); Iowa Code Ann. § 724.26(1); Ky. Rev. Stat. Ann. § 527.040(1); Me. Rev. Stat. Ann. tit. 15, § 393(1)(A-1)(1); Md. Code Ann. Pub. Safety §§ 5-101(g)(2), 5-133(b)(1); Mass. Gen. Laws Ann. ch. 140, § 129B(1)(i)(A) and (ii)(A); Mich. Comp. Laws Ann. § 750.224f (1); Minn. Stat. Ann. § 624.713, subdiv. 1(10)(i); Miss. Code Ann. § 97-37-5(1); Mo. Rev. Stat. § 571.070.1(1); Neb. Rev. Stat. Ann. § 28- 1206(1)(a)(i); Nev. Rev. Stat. Ann. § 202.360.1(b); N.H. Rev. Stat. Ann. § 159:7; N.J. Stat. Ann. § 2C:58-3(c)(1); N.M. Stat. Ann. § 30-7-16(A); N.Y. Penal Law § 400.00(1)(c); N.C. Gen. Stat. Ann. § 14-415(b)(5); N.D. Cent. Code Ann. § 62.1-2-1(1)(b); 6 N. Mar. I. Code § 10610(a)(3); Okla. Stat. Ann. tit. 21, § 1283(A); Or. Rev. Stat. Ann. § 166.270(1); P.R. Laws

28

remaining eleven States cover specific types of crimes, such as violent crimes or drug crimes.[12]

This century-old, nationwide tradition of disarming convicted felons (including non-violent felons) further demonstrates that such restrictions are firmly rooted in our Nation's historical tradition. This is markedly unlike the laws invalidated in *Heller* and *Bruen*, which were "outlier" regulations. *See Bruen*, 597 U.S. at 78 (Alito, J., concurring) (noting that the regulation at issue in *Heller* "was an extreme outlier; only a few other jurisdictions in the entire country had similar laws"); *id.* at 79-80 (Kavanaugh, J., concurring) (contrasting "New York's outlier may-issue regime" with the "shall-issue licensing regimes" that existed in 43 of the other states). A law, such as the prohibition on felon

—————

Ann. tit. 25, § 462a(a)(2); Tenn. Code Ann. § 39-17-1307(c); Tex. Penal Code Ann. § 46.04(a); Utah Code Ann. § 76-10-503(1); Va. Code Ann. § 18.2-308.2(A)(i); V.I. Code Ann. tit. 23, § 456a(a)(1); Wash. Rev. Code Ann. § 9.41.040(2)(a)(i)(A); W. Va. Code Ann. § 61-7-7(a)(1); Wis. Stat. Ann. § 941.29(1m)(a)-(b); Wyo. Stat. Ann. § 6-8-102(c).

[12] *See* Ala. Code § 13A-11-72(a)(1); Idaho Code Ann. § 18-310(2); Kan. Stat. Ann. § 21-6304(a); La. Stat. Ann. § 14:95.1(A); Mont. Code Ann. § 45-8-313(1); Ohio Rev. Code Ann. § 2923.13(A)(2)-(3); 18 Pa. Stat. & Cons. Stat. Ann. § 6105(a)(1) and (b); 47 R.I. Gen. Laws Ann. § 11-47-5(a)(1); S.C. Code Ann. § 16-23-30(A)(1); S.D. Codified Laws § 22-14-15; 13 Vt. Stat. Ann. § 4017(a).

29

possession of firearms, which "has become general throughout the United States, and particularly one that has the validation of long, accepted usage, bears a strong presumption of constitutionality." *Doe v. Reed*, 561 U.S. 186, 221 (2010) (Scalia, J., concurring in the judgment). Such a "universal and long-established" practice should take precedence over "historical and academic speculations" about what inferences to draw from an inconclusive Founding-era record. *McIntyre v. Ohio Election Comm'n*, 514 U.S. 334, 377 (1995) (Scalia, J., dissenting).

### c. The Nation's Historical Tradition of Firearms Regulation Supports the Constitutionality of Laws Disarming Categories of Individuals Who Present a Danger of Misuse

In addition to the historical tradition supporting disarmament of felons, Section 922(g)(1) is consistent with a historical tradition of disarmament of individuals who are deemed by the legislature to pose a danger of misuse of firearms, which would threaten others or the public. In *Rahimi*, the Supreme Court recognized that the nation's "tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." 144 S. Ct. at 1902. The Supreme Court was considering 18 U.S.C. § 922(g)(8), which requires a court to find that a particular individual poses a threat, so it had no occasion to consider the application of this principle to a general prohibition based on a legislative determination that a particular category of individuals poses a threat. Nonetheless, the Court was careful to explain

30

that its decision did "not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse," and it cited the language in *Heller* that affirmed prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 1901 (citing *Heller*, 554 U.S. at 626).

While *Rahimi* did not address a categorical prohibition, an examination of history provides clear support for such general prohibitions, and this historical tradition also supports the constitutionality of Section 922(g)(1).

By the time of the Second Amendment's ratification in 1791, there was a robust tradition of legislatures exercising broad "discretion to disqualify categories of people from possessing firearms to address a threat purportedly posed by these people to an orderly society and compliance with its legal norms." *Jackson*, 69 F.4th at 503; *see also Range I*, 53 F.4th at 274 (recognizing historical authority to "categorically disqualif[y] people from possessing firearms based on a judgment that certain individuals were untrustworthy parties to the nation's social compact").

The historical basis for such categorical prohibitions originates in English legal tradition, an important source because the Second Amendment "'codified a right inherited from our English ancestors.'" *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 599). Among the limits well-established in England was the authority to disarm classes of people who, in the legislature's view, could not be depended upon to obey the

31

rule of law. One law, for example, provided that any Catholic who refused to make a declaration renouncing his or her faith could not "have or keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person)." 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73 (1688). Enacted shortly after the Glorious Revolution of 1688—when the Protestants King William and Queen Mary succeeded the Catholic King James II—that statute reflected the new government's perception that Catholics who refused to renounce their faith were among "those who are unwilling to obey the government and its laws." *Jackson*, 69 F.4th at 502; *see also Range I*, 53 F.4th at 275 (recognizing that Catholics were disarmed based on "perceived disrespect for and disobedience to the Crown and English law").

That example is particularly relevant because the same Parliament "wr[ote] the 'predecessor to our Second Amendment' into the 1689 English Bill of Rights," which similarly drew a religion-based distinction, among other limitations. *Bruen*, 597 U.S. at 44 (quoting *Heller*, 554 U.S. at 593). "Englishmen had never before claimed the right of the individual to arms." *Bruen*, 597 U.S. at 44-45. And when they first formally claimed that right, the English ensured that the government retained the power—which it in fact exercised—to disarm a class of the population based on concerns that the class's members would not abide by the law.

32

The American colonies inherited the English tradition of broad legislative authority to disarm classes of people viewed as untrustworthy or dangerous. Firearm regulations directed toward disarming Native Americans and Black people were pervasive. *See* Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28-29 (2006). Other colonial laws "followed longstanding English practice" by disarming Catholics who refused to take an oath of allegiance. *Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment) (citing Virginia law); *see also* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020) (citing Maryland, Virginia, and Pennsylvania laws). While those specific "categorical prohibitions of course would be impermissible today under other constitutional provisions, they are relevant here in determining the historical understanding of the right to keep and bear arms." *Jackson*, 69 F.4th at 503. Moreover, "colonial history furnishes numerous examples in which full-fledged members of the political community as it then existed—*i.e.*, free, Christian, white men— were disarmed due to conduct evincing inadequate faithfulness to the sovereign and its laws." *Range I*, 53 F.4th at 276-77 (collecting examples).

During the Revolutionary War, American legislatures passed numerous laws disarming individuals who failed to demonstrate loyalty to the emergent government, and who were therefore seen as dangerous to the nascent nation's independence. *Jackson*, 69 F.4th at 503; *see also Range I*, 53 F.4th at 277 (observing that legislatures "disarm[ed] non-violent individuals

33

because their actions evinced an unwillingness to comply with the legal norms of the nascent social compact"). An early example was a 1775 Connecticut law providing that any person convicted of "libel[ing] or defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 193 (1775 Conn. law). George Washington discussed the Connecticut law, including its "penalty of being disarmed," in a letter to the Governor of Rhode Island, adding that "the other colonies ought to adopt similar" measures. Letter from George Washington to Nicholas Cooke (Jan. 6, 1776), *in* 3 *The Writings of George Washington* 323 (Worthington Chauncey Ford ed., 1889). And the Continental Congress recommended that the colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. 4 *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776).

In short order, similar laws were passed by a number of colonial governments. For example, a New York law provided that a person would "be disarmed" upon conviction for furnishing provisions to the British army or for opposing the authority of the Continental Congress. Resolutions of Sept. 1, 1775, *in* 1 *Journals of the Provincial Congress, Provincial Convention, Committee of Safety and Council of Safety of the State of New-York* 132 (1842). And similar laws were passed

34

in at least Massachusetts, Rhode Island, New Jersey, Pennsylvania, Virginia, North Carolina, and South Carolina. *See* 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479-84 (1886) (1776 Mass. law); 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. law); *Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777) (1777 N.J. law); 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112-13 (1903) (1777 Pa. law); 9 *The Statutes at Large; Being a Collection of All the Laws of Virginia* 282 (1821) (1777 Va. law); 1 *The Public Acts of the General Assembly of North Carolina* 231 (1804) (1777 N.C. law); *Journal of the Provincial Congress of South Carolina, 1776*, at 77 (1776). These disarmament measures, adopted just as the United States was first emerging as an independent nation, reflect that "legislatures traditionally possessed discretion to disqualify categories of people from possessing firearms to address a threat purportedly posed by these people." *Jackson*, 69 F.4th at 503; *see also Range I*, 53 F.4th at 279 (recognizing that "legislatures were understood to have the authority and broad discretion to decide when disobedience with the law was sufficiently grave to exclude even a non-violent offender from the people entitled to keep and bear arms").

The historical background of the Second Amendment's adoption further demonstrates that the Founders viewed the constitutional right to bear arms as compatible with broad legislative authority to disarm groups legislatures did not trust to follow the law. One

35

"Second Amendment precursor[ ]" that the Supreme Court has described as "highly influential," *Heller*, 554 U.S. at 604, is particularly instructive. *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). When the Pennsylvania ratifying convention met in 1787, one of the "main issues throughout the . . . debate" was the Antifederalists' objection to the Constitution's "lack of a Bill of Rights." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627 (1971). Although the Antifederalists did not persuade a majority of the convention to reject ratification on that basis, their principal objections were ultimately vindicated four years later through the adoption of the Bill of Rights, eight provisions of which—including the Second Amendment—echoed a set of amendments first proposed by the Pennsylvania Antifederalists. *Id.* at 628. The Pennsylvania Antifederalists' proposed constitutional amendment regarding the right to bear arms stated that "no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals." *Id.* at 665 (emphasis added). Thus, the founding generation recognized that both "crimes committed" and "real danger of public injury" can independently supply grounds for a legislature to prohibit firearm possession. *See Medina*, 913 F.3d at 158-59 ("The use of the word 'or' indicates that criminals, in addition to those who posed a 'real danger' (such as the mentally ill, perhaps), were proper subjects of disarmament."); *Range I*, 53 F.4th at 280 (observing that the proposal "distinguished between criminal convictions and dangerousness, and provided that *either* could support disarmament" (emphasis in original)).

36

The Pennsylvania Antifederalists were not alone in proposing a Second Amendment precursor that expressly permitted laws disarming categories of persons deemed to be dangerous to the public or the state. At the Massachusetts convention, Samuel Adams proposed an amendment providing that the "Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 2 Schwartz, *supra*, at 675, 681 (emphasis added). And in New Hampshire, the convention recommended an amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in *Actual Rebellion*." *Id.* at 758, 761 (emphasis added).

The Second Amendment as adopted does not include the same language as those proposals. But it would have been "obvious" to the founders that certain groups, including "the felon," Cooley, *supra*, at 29, could be subject to disarmament laws consistent with the "*pre-existing* right" that was "codified" in the Second Amendment, *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 592). *See also* Amar, *supra*, at 48; Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (explaining that Founding-era proponents of a constitutional right to bear arms "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because that limitation "was understood"). Given the language of the influential proposals and the apparent absence of any meaningful Founding-era "disputes regarding the lawfulness" of potential regulations disarming criminals,

37

courts "can assume it settled" that such regulations are "consistent with the Second Amendment." *See Bruen*, 597 U.S. at 30 (noting that the lack of historical dispute over prohibitions on firearm possession in sensitive places such as legislative assemblies and courtrooms supports the conclusion that such prohibitions are lawful).

### d. Applying These Principles, Section 922(g)(1) Is Consistent with the Nation's Historical Tradition

The historical tradition surveyed above demonstrates Section 922(g)(1)'s constitutionality. *Bruen* calls for an analysis of "how and why" the historical and challenged regulations "burden a law-abiding citizen's right to armed self-defense." 597 U.S. at 29; *see also Rahimi*, 144 S. Ct. at 1898. Of course, Section 922(g)(1) imposes no burden on "a law-abiding citizen's right to armed self-defense" because it applies only to people who have removed themselves from the law-abiding citizenry by committing offenses punishable by more than one year of imprisonment. In any event, the historical record shows that felons were historically subjected to dispossession of firearms—in addition to far more severe consequences, including estate forfeiture and capital punishment. History additionally shows that legislatures disqualified categories of people from possessing firearms, just as felon-disarmament statutes do today, based on legislative judgments that the disarmed people posed a danger to others or to public order.

38

This was exactly the legislative judgment that Congress made in enacting Section 922(g)(1). Congress enacted this law "in order to keep firearms away from potentially dangerous persons." *Lewis v. United States*, 445 U.S. 55, 67 (1980); *see also* S. Rep. No. 90-1097, at 2114 (1968) (finding that the "ease with which" firearms could be acquired by "criminals[] . . . and others whose possession of firearms is similarly contrary to the public interest" is "a matter of serious national concern"). Taken as a whole, Section 922(g)'s prohibitions on possession of firearms by particular categories of people whom Congress found to pose a credible risk of danger "probably does more to combat gun violence than any other federal law." *Rehaif v. United States*, 588 U.S. 225, 239 (2019) (Alito, J., dissenting). In making this legislative judgment, Congress was acting within a long-established historical tradition permitting similar types of firearm restrictions. In short, this statute is "relevantly similar" to restrictions from before the Founding to the present day, both in terms of "why and how it burdens the Second Amendment right." *Rahimi*, 144 S. Ct. at 1901.

Davila suggests that this historical context is insufficient because scholars have not identified a Founding-era law that specifically banned felons from possessing firearms. (Br. 8-14). But that is the precise analytical error that the Supreme Court rejected in *Rahimi*, where it noted that some "have misunderstood the methodology of our recent Second Amendment cases. These precedents were not meant to suggest a law trapped in amber." 144 S. Ct. at 1897. The Court went on to explain that "the Second Amendment permits more than just those regulations identical to

39

ones that could be found in 1791." *Id.* at 1897-98.
"[T]he law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* at 1898 (quoting *Bruen*, 597 U.S. at 30).

This Court has also explained the nature of the historical inquiry in similar terms:

> [T]he absence of a distinctly similar historical regulation in the presented record, though undoubtedly relevant, can only prove so much. Legislatures past and present have not generally legislated to their constitutional limits. Reasoning from historical silence is thus risky; it is not necessarily the case that, if no positive legislation from a particular place is in the record, it must be because the legislators there deemed such a regulation inconsistent with the right to bear arms. . . . Thus, the paucity of eighteenth century gun control laws might have reflected a lack of political demand rather than constitutional limitations. Stated differently, novelty does not mean unconstitutionality. That is so even if the problems faced by past generations could be described, at a high level of generality, as similar to the problems we face today.

*Antonyuk v. Chiumento*, 89 F.4th 271, 301-02 (2d Cir. 2023); *see also Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring) ("To be *consistent* with historical limits, a

40

challenged regulation need not be an updated model of a historical counterpart.").

By demanding a historical twin, Davila effectively asks this Court to disregard the methodology actually used in *Bruen*, *Rahimi*, and *Antonyuk*, and not to "apply[ ] constitutional principles to novel modern conditions." *Bruen*, 597 U.S. at 31. But *Bruen* teaches that "the Second Amendment's historically fixed meaning applies to new circumstances," so the Second Amendment "can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 28; *see also Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring) (demanding "overly specific analogues" for contemporary firearm regulations would "force[ ] 21st-century regulations to follow late-18th-century policy choices, giving us a law trapped in amber" and would wrongly "assume[ ] that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority"); *id.* at 1905 (Sotomayor, J., concurring) (if courts required precise historical analogues for each contemporary firearm restriction, "the legislatures of today would be limited not by a distant generation's determination that such a law was unconstitutional, but by a distant generation's failure to consider that such a law might be necessary").

Indeed, the historical analogues for Section 922(g)(1), as described above, are substantially closer than the historical examples on which the Supreme Court relied in rejecting a constitutional challenge to Section 922(g)(8) in *Rahimi*. There, the Court primarily relied on the Founding-era "going armed" and

41

surety laws to hold that an individual who poses a clear threat of physical violence may be disarmed. *Rahimi*, 144 S. Ct. at 1901. In doing so, it illustrated how to identify whether a challenged regulation "comport[s] with the principles underlying the Second Amendment." *Id.* at 1898. And it did not insist on a more specific match between Section 922(g)(8) and the historical examples, in stark contrast to the dissenting opinion. *Compare id.* at 1898, 1901 (explaining that even "when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster," and concluding that Section 922(g)(8) was "relevantly similar" to the going armed and surety laws), *with id.* at 1934-35 (Thomas, J., dissenting) (arguing that Section 922(g)(8) was unlike those historical laws because those laws were aimed at "quashing treason and rebellion" while Section 922(g)(8) is aimed at "interpersonal violence"). Here, the historical record is replete with both more numerous and more closely analogous restrictions than those found sufficient in *Rahimi*, which demonstrates that Section 922(g)(1) is constitutional.

### e. Davila May Not Obtain an As-Applied Exemption from Section 922(g)(1) Based on the Nature of His Prior Violent Felonies

Davila further argues that Section 922(g)(1) is unconstitutional "as applied" to him, based on his particular prior felony convictions, which include manslaughter and assault. (Br. 8-13). The argument fails for several reasons.

42

*First*, nothing in the Supreme Court's cases suggests the need for a felony-by-felony analysis of Section 922(g)(1)'s constitutionality. To the contrary, *Rahimi* explained that restrictions on felon firearm possession are "presumptively lawful," with no explicit limitation on the nature of the felons' crimes. *Rahimi*, 144 S. Ct. at 1902; *see Heller*, 554 U.S. at 626, 635; *see also Jackson*, 69 F.4th at 502 ("Given these assurances by the Supreme Court, and the history that supports them, we conclude that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1).").

*Second*, recognizing that Congress may disarm individuals who have been convicted of crimes that satisfy the common definition of a felony—that is, crimes punishable by imprisonment for more than one year—is consistent with how the Supreme Court has interpreted other Bill of Rights provisions that require distinctions among different types of crimes. The Supreme Court has traditionally focused on the "maximum authorized penalty," which "provides an objective indication of the seriousness with which society regards the offense," rather than on "the particularities of an individual case." *Lewis v. United States*, 518 U.S. 322, 328 (1996). For example, the Grand Jury Clause applies only to "capital" or "infamous" crimes, U.S. Const. amend. V, and a crime is "infamous" if it is punishable by "imprisonment for more than a year," *Branzburg v. Hayes*, 408 U.S. 665, 687 n.24 (1972). The Sixth Amendment right to a jury trial similarly does not extend to petty offenses, and an offense is petty if it is punishable by a prison term of six months or less. *See Blanton v. City of North Las Vegas*, 489 U.S. 538,

43

541-45 (1989). A similar approach should inform interpretations of the Second Amendment, which is subject to the same "body of rules" as "the other Bill of Rights guarantees." *Bruen*, 597 U.S at 70. In particular, when a person has been convicted of a crime punishable by more than one year of imprisonment, the maximum authorized penalty for the offense by itself establishes that the crime is serious enough to support disarmament. *See Medina*, 913 F.3d at 160-61.

*Third*, a regime of individualized as-applied challenges to Section 922(g)(1) would distort the separation of powers. In our constitutional system, the Legislative Branch traditionally determines the consequences of criminal convictions—not only the punishment, but also the collateral consequences, such as disfranchisement, disqualification from jury duty, ineligibility for public benefits, sex-offender registration, and disarmament. The Executive Branch, in turn, traditionally grants clemency if it determines that the punishment or the collateral consequences prescribed by law do not fit a particular offender's circumstances. Creating a system of as-applied exemptions from Section 922(g)(1) would in effect usurp the Executive Branch's role of deciding when to make "exceptions" to the "rigor" and "severity" of the "criminal code" enacted by Congress. The Federalist No. 74, at 501 (Alexander Hamilton) (Jacob E. Cooke ed., 1961).

*Fourth*, a felony-by-felony analysis of Section 922(g)(1)'s constitutionality would treat the right to possess arms differently from other rights that criminals forfeit upon conviction. As discussed above, States have long denied convicts the right to vote, the right to

44

serve on juries, and the right to hold public office. (*See supra* Points I.B.2.a & I.B.2.b.i). Although these limitations are longstanding, courts have not held that a felon may challenge those disabilities on the ground that they do not fit his felony or his circumstances. This Court should not treat the right to possess arms any differently.

*Fifth*, individualized as-applied challenges to Section 922(g)(1) would pose serious problems of judicial administration, creating a body of law that, in its reliance on historical analysis, would be more complicated to apply and more prone to creating inconsistent results than even the categorical approach. *See Quarles v. United States*, 139 S. Ct. 1872, 1881 (2019) (Thomas, J., concurring) (criticizing the categorical approach because it is "difficult to apply and can yield dramatically different sentences depending on where a [crime] occurred"). This Court should reject any invitation to create such an unwieldy and unpredictable new body of law.

*Sixth*, even if as-applied challenges were permissible, Section 922(g)(1) at the very least is constitutional as applied to a felon like Davila, who has multiple prior violent felony convictions, including for manslaughter and assault. Even those courts that have questioned the application of Section 922(g)(1) to individuals with certain types of nonviolent convictions have nonetheless recognized that the statute is constitutional as applied to a defendant with the type of criminal history that Davila has here. *See United States v. Gay*, 98 F.4th 843, 846 (7th Cir. 2024) (even "assum[ing] for the sake of argument that there is

45

*some* room for as-applied challenges" to Section 922(g)(1), the law is constitutional as applied to a defendant with prior violent felony convictions) (emphasis in original); *United States v. Williams*, --- F.4th ---, 2024 WL 3912894 at *17 (6th Cir. Aug. 23, 2024) (holding that Section 922(g)(1) is constitutional as applied to defendant with prior violent felony convictions).

\* \* \*

In sum, both the Supreme Court and this Court have long recognized that laws like Section 922(g)(1) that prohibit felons from possessing firearms do not run afoul of the Second Amendment. In *Rahimi*, the Supreme Court again embraced this settled principle. And because this Nation's historical tradition of firearm regulation is consistent with Section 922(g)(1), the District Court did not err by rejecting Davila's challenge to Section 922(g)(1).

46

**CONCLUSION**

**The judgment of conviction should be affirmed.**

Dated:      New York, New York
                September 9, 2024

                                Respectfully submitted,

                                DAMIAN WILLIAMS,
                                *United States Attorney for the*
                                *Southern District of New York,*
                                *Attorney for the United States*
                                *of America.*

DANIELLE R. SASSOON,
NATHAN REHN,
        *Assistant United States Attorneys,*
                *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 10,918 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: NATHAN REHN,
*Assistant United States Attorney*